# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 09-1639
_____

Sierra Club; Friends of the Boundary     *
Waters Wilderness; Defenders of     *
Wildlife; Northeastern Minnesotans     *
for Wilderness,     *
    *
         Appellants,     *
    *    Appeal from the United States
      v.     *    District Court for the
    *    District of Minnesota.
Abigail Kimbell, Chief of the United     *
States Forest Service; Tom Vilsack,     *
Secretary of Agriculture,     *
    *
         Appellees.     *
    *
_____     *
    *
Minnesota Forest Industries, Inc.;     *
Minnesota Timber Producers     *
Association; Lake County; All Terrain     *
Vehicle Association of Minnesota;     *
Blue Ribbon Coalition, Inc.,     *
    *
      Intervenor Defendants/Appellees,     *
    *
_____     *
    *
The Ruffed Grouse Society,     *
    *
      Amicus on Behalf of Appellee,     *
    *

Mark Holsten, as Commissioner of The    *
Minnesota Department of Natural       *
Resources,                              *
                                     *
    Amicus on Behalf of Appellee.    *

———————

Submitted: February 9, 2010
Filed: October 18, 2010

———————

Before LOKEN, Chief Judge,[1] COLLOTON and GRUENDER, Circuit Judges.

———————

COLLOTON, Circuit Judge.

In July 2004, the United States Forest Service issued a Land and Resource Management Plan for the Superior National Forest (the "forest plan"). Sierra Club, Friends of the Boundary Waters Wilderness, and Northeastern Minnesotans for Wilderness (collectively, "Sierra Club") sought judicial review of the forest plan in the district court. As relevant to this appeal, Sierra Club argued that the Forest Service's assessment of the forest plan's environmental impacts violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h. In particular, Sierra Club claimed that the Forest Service had failed to consider the plan's effects on the Boundary Waters Canoe Area Wilderness ("BWCAW"). The district court[2] determined that the Forest Service had considered adequately the impacts on the nearby wilderness area in accordance with NEPA, and therefore granted the agency's

———————

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

motion for summary judgment. *Sierra Club v. Kimbell*, 595 F. Supp. 2d 1021 (D. Minn. 2009). Sierra Club appeals, and we affirm.

I.

The Superior National Forest was created by a proclamation of President Theodore Roosevelt in 1909 and expanded through a series of subsequent acquisitions. Today, the forest encompasses over three million acres in northeastern Minnesota along the United States-Canadian border near Lake Superior. Within the Superior National Forest lies a 1.1 million acre wilderness area known as the BWCAW. The BWCAW is one of the nation's most popular wilderness areas, attracting nearly 300,000 visitors annually to its many lakes and pristine forested landscapes.

Federal efforts to protect the BWCAW date back to at least 1926, when 1000 square miles within the Superior National Forest were set aside as a canoe recreation area. The Wilderness Act of 1964 expanded the protected area and officially designated the BWCAW as wilderness, thereby restricting authorized uses of the area to preserve its wilderness character. *See* 16 U.S.C. § 1133(b). In 1978, the Boundary Waters Canoe Area Wilderness Act, Pub. L. No. 95-495, 92 Stat. 1649 (1978), gave the area its current name, set aside additional acreage as wilderness, and further restricted authorized uses. *Id.* §§ 3, 4. The BWCAW Act ended all logging within the wilderness and established stricter limitations on motorized recreational use. *Id.* §§ 4(c), (e), (f), 6(a).

The Superior National Forest, which includes the entire BWCAW, is part of the National Forest System, and is subject to the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1687. As relevant to this appeal, NFMA directs the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." *Id.* § 1604(a). A forest plan is a

"general planning tool" that establishes the "overall management direction for the forest unit for ten to fifteen years," and serves as "a programmatic statement of intent" to guide "future site-specific decisions." *Sierra Club v. Robertson*, 28 F.3d 753, 755, 758 (8th Cir. 1994). In developing a forest plan, the Forest Service, which manages the Forest System, must comply with the Multiple Use-Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531. This Act requires the Forest Service to account for both environmental and economic considerations in the plan, *see* 16 U.S.C. § 1604(g), including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id.* § 1604(e)(1).

The Forest Service also must develop a forest plan in compliance with the procedural requirements of NEPA. Under NEPA, if an agency proposes to undertake a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), the agency must prepare an environmental impact statement ("EIS"). The Forest Service has therefore promulgated regulations requiring the preparation of a draft and final EIS in conjunction with a proposed forest plan. *See* 36 C.F.R. § 219.10(b) (2000).[3] The Forest Service must consider in the EIS a broad range of reasonable alternatives to help identify the alternative that best maximizes "net public benefits." *Id.* § 219.12(f). The agency also must evaluate the "physical, biological, economic, and social effects" of those alternatives in compliance with NEPA procedures. *Id.* § 219.12(g), (h).

_____

[3]Section 219 of Title 36 of the Code of Federal Regulations, which contains the substantive rules regarding the adoption of forest plans, was substantially revised in November 2000. *See* 65 Fed. Reg. 67,514 (Nov. 9, 2009). Yet the regulation allows for revisions started under the prior rules to be completed under those rules at the election of the Forest Service. 36 C.F.R. § 219.35(b) (2001). The Forest Service elected here to continue the revision process under the original regulations promulgated in 1982. *See* 47 Fed. Reg. 43,026 (Sept. 30, 1982). Therefore, unless otherwise indicated, references to Section 219 of Title 36 are to the 1982 rules, as set forth in the July 1, 2000 edition of the Code of Federal Regulations.

-4-

The development and implementation of a forest plan generally "involves a two-stage process." *Robertson*, 28 F.3d at 755. Initially, the Forest Service creates a proposed forest plan and accompanying draft and final EIS to evaluate alternative management scenarios. *See* 36 C.F.R. § 219.10(b). After receiving public input, the Regional Forester either approves or disapproves the proposed plan. *Id.* § 219.10(b), (c). If the forest plan is approved, the Forest Service issues a record of decision to document the rationale for the management approach adopted in the plan. *Id.* § 219.10(c)(1). The process then moves to a second stage in which the forest plan is implemented and "individual site-specific projects are proposed and assessed." *Robertson*, 28 F.3d at 755. An approved forest plan, for example, might establish logging goals for the forest as a whole, but before the Forest Service can permit a specific logging project, the agency must, among other things, ensure that the project conforms with the forest plan, *see* 36 C.F.R. § 219.10(e), and conduct site-specific environmental analysis pursuant to NEPA. *See* 40 C.F.R. §§ 1502.14, 1508.9(b); *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998).

This case focuses on a dispute involving the first stage of the forest planning process for the Superior National Forest. Pursuant to NFMA's requirement that a forest plan be revised "at least every fifteen years," *see* 16 U.S.C. § 1604(f)(5)(A), the Forest Service announced in 1997 its intention to revise the plan for the Superior National Forest that had been in effect since 1986. After a period of study and analysis, the Forest Service issued a draft EIS in 2003. The draft EIS discussed and compared the anticipated environmental impacts of several proposed approaches to forest management. The Forest Service considered public comments to the draft EIS, and, in July 2004, issued a final EIS ("FEIS"), a record of decision ("ROD"), and the revised forest plan.

The FEIS identifies seven alternative approaches for managing the Superior National Forest. These approaches, labeled A through G, differ in the amount and location of human activity (including logging and recreation) that they allow, and in

their goals for plant and animal life in the forest. Alternative B, for example, would reduce timber harvesting from current levels, restore old growth forest, designate new wilderness study areas adjacent to the BWCAW, and decrease the number of new ATV and snowmobile trails. FEIS § 2-14. Similarly, Alternative D emphasizes non-motorized recreational activities, such as hiking and canoeing, along with the restoration of old growth forest through a reduction in logging. FEIS § 2-19. Alternative C, by contrast, allows an increase in timber production relative to the 1986 plan. FEIS § 2-17. Alternative E falls between these options with respect to timber, emphasizing more harvesting than Alternatives B and D, but less than Alternative C. FEIS § 2-22. Alternative E also permits the greatest number of new snowmobile and ATV trails, and designates no new wilderness study areas. FEIS § 2-24.

A common feature of each alternative is a commitment to continue to manage the BWCAW in accordance with the Boundary Waters Canoe Area Plan. The Forest Service adopted this plan in 1993 along with an EIS specific to the wilderness area. The 2004 forest plan and accompanying FEIS, therefore, anticipate changes to the management approach only for those areas of the Superior National Forest outside of the Boundary Waters. Another common point among the alternatives is their use of geographic "analysis areas" that extend in and out of the Boundary Waters. For example, the FEIS frequently employs the Northern Superior Uplands as the area in which environmental impacts are measured. FEIS § 3.1-24. This vast area, which includes the BWCAW, is preferred because "[m]any ecosystem processes essential for sustainability . . . operate at large spatial scales." FEIS § 3.3.2-2. Each of the alternatives also identifies a combination of "management areas" that emphasize different land use objectives, such as timber production or scenic recreation. The management areas vary in size and location by alternative. FEIS § 2-9.

In the record of decision issued with the FEIS, the Forest Service identified Alternative E as its choice to guide the management of the Superior National Forest. According to the agency, Alternative E maximizes the net benefit to the public by

maintaining the long-term health of the forest while providing the best mix of sustainable economic, social, and ecological benefits. The revised forest plan discusses in detail how the forest will be managed under Alternative E, and establishes a series of objectives, standards, and guidelines to govern future site-specific activities and to achieve desired forest conditions. Under Alternative E, the forest plan divides the area of the national forest outside of the BWCAW into three "spatial management zones." FEIS § 3.2-60. These zones permit varying levels of resource use. Together with the management areas, they establish forest-wide land use patterns.

Sierra Club's present complaint is related to the spatial management zones. In the revised forest plan, the geographic area designated as Spatial Zone 3 borders the BWCAW. The management areas in Zone 3 are eligible for the vast majority of timber harvesting permitted under the plan, FEIS § 3.2-54, and they allow motorized recreational activities. The Forest Service contends that the purpose of the spatial zones is simply to ensure well-distributed habitats within the forest. Sierra Club disagrees, and argues that the intense timber harvesting and other activities permitted near the BWCAW under Alternative E will have adverse "edge effects" on the wilderness area that the Forest Service failed to consider in the FEIS. Those alleged effects include habitat degradation along the wilderness edge, noise pollution, impairment of water quality, and increased illegal access to the BWCAW by off-road vehicles. Sierra Club contends that the Forest Service violated NEPA by approving the revised forest plan without analyzing the plan's impact on the BWCAW, including these "edge effects," and that the district court erred in granting the Forest Service's motion for summary judgment.

## II.

Before reaching the merits of Sierra Club's NEPA claim, we must consider whether Sierra Club has standing to challenge the forest plan and FEIS. The government raised no objection to standing in the district court, but it presses the issue on appeal, and we must consider a challenge to our jurisdiction at any time in the proceeding. *See* Fed. R. Civ. P. 12(h)(3); *Goos v. ICC*, 911 F.2d 1283, 1289 (8th Cir. 1990).

Article III establishes as a constitutional minimum for standing the following three elements: an injury in fact, meaning the actual or imminent invasion of a concrete and particularized legal interest; a causal connection between the alleged injury and the challenged action of defendant; and a likelihood that the injury will be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Forest Service contends that because Sierra Club alleges only the potential for future harm at later stages of the forest planning process, it fails to satisfy the injury-in-fact requirement in this initial phase.

The Forest Service relies heavily on our decision in *Sierra Club v. Robertson*, 28 F.3d 753 (8th Cir. 1994). *Robertson* held that the plaintiffs in that case lacked standing to challenge a forest plan for the Ouachita National Forest, because further agency action was necessary before the Forest Service could take steps that would cause injury. *Id.* at 758. The plaintiffs in *Robertson* limited their allegation of injury to a claim that the amount and method of timber harvesting permitted by the forest plan caused environmental or aesthetic harm. Because NEPA required an additional stage of site-specific analysis before any timber could actually be cleared, this court determined that the asserted injury was not sufficiently imminent at the initial forest planning stage to create an injury in fact. *Id.* at 758-60. This view has been criticized by the Seventh Circuit, *see Sierra Club v. Marita*, 46 F.3d 606, 612-13 (7th Cir.

1995), but endorsed by the Eleventh Circuit in the closely related context of ripeness. *See Wilderness Soc'y v. Alcock*, 83 F.3d 386, 389-91 (11th Cir. 1996).

Sierra Club argues in reply that *Robertson* is not controlling here, because that case involved only a NFMA claim, not a NEPA claim. This is incorrect. The opinion of this court in *Robertson* expressly states that the plaintiffs alleged violations of both "NFMA *and* NEPA." 28 F.3d at 757 (emphasis added). The district court's published opinion in *Robertson* also makes clear that the plaintiffs' complaint raised claims under NFMA and NEPA, and the district court specifically analyzed a series of NEPA claims. *See Sierra Club v. Robertson*, 810 F. Supp. 1021, 1024, 1029-30 (W.D. Ark. 1992).

Sierra Club also cites *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808 (8th Cir. 2006), to support its standing to bring this NEPA challenge. The court in *Army Corps* concluded that the plaintiffs had standing under NEPA to dispute an agency's environmental assessment of a levee construction project, even though further agency action was required before injury would occur. *Id.* at 816. *Army Corps*, however, made no mention of *Robertson*, and of course could not overrule a prior panel decision. *Army Corps* is consistent with the established rule that a defendant's action need not be the "very last step in the chain of causation" to cause cognizable injury, *Bennett v. Spear*, 520 U.S. 154, 169 (1997), but *Robertson* is more directly on point with respect to whether a forest plan causes an injury in fact.

To the extent the plaintiffs here rely on the forest plan's authorization of additional timber harvesting and the FEIS's alleged failure to analyze the specific impacts of that harvesting, *Robertson* poses a formidable hurdle. We conclude, however, that the plaintiffs have standing based on other aspects of the agency's action. The plaintiffs here, unlike those in *Robertson*, claim injuries that occur with the adoption of the forest plan, not merely harms that arise at some future time after further analysis and action by the agency. Specifically, Sierra Club argues that the

plan itself, with its endorsement of Alternative E, represents a final agency decision to reject features in other alternatives, such as the designation of new wilderness study areas adjacent to the BWCAW, and a decrease in motorized recreational activity near the wilderness. Had the Forest Service properly evaluated the impacts of its decision on the wilderness area, Sierra Club contends, the agency perhaps would have chosen to manage the forest pursuant to a different alternative that would not interfere with the plaintiffs' enjoyment of the forest near the BWCAW.

Standing can be based on harms to recreational or even aesthetic interests, *see Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972), and organizations like Sierra Club "can assert the standing of their members." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Here, the plaintiff organizations submitted affidavits from several individual members asserting imminent harms from the agency's action. One member and frequent visitor to the Superior National Forest claimed that the agency's selection of Alternative E, which resulted in the designation of no new wilderness study areas, immediately diminished her opportunities for non-motorized recreation near the BWCAW. Another member described a similarly imminent interest in "increasing opportunities for non-motorized recreation" in areas adjacent to the wilderness area that was harmed by the selection of Alternative E.

While alternatives rejected by the Forest Service would create wilderness study areas or additional non-motorized recreational opportunities near the BWCAW, Alternative E is a final agency decision to eliminate those options. Alternatives B and D, for example, both call for twelve areas that border the BWCAW, comprising thousands of acres, to be designated as wilderness study areas, in which road development and motorized recreation would not be allowed. FEIS § 3.7-9. The FEIS states that these areas "could provide a more immediate wilderness experience," including opportunities for non-motorized recreation in a pristine setting. FEIS § 3.7-11. Alternative E allows motorized activities in many of these areas. FEIS § 3.7-9.

-10-

Alternative D would surround the BWCAW with "Semi-primitive" management areas, thereby permitting few visitors, minimal roads, and, in many cases, no motorized vehicles, in order to preserve the natural conditions of the forest. FEIS §§ 3.8-5, 3.8-26. Alternative D also would result in the closure of "[s]ome existing motorized trails" near the BWCAW, FEIS § 3.8-49, and prohibit all cross-country snowmobile travel in the forest. FEIS § 3.8-56. This feature would have the immediate effect of allowing non-motorized recreationists to travel without encountering disruptions like noise pollution and wildlife habitat destruction. FEIS § 3.8-58. Alternative E, by contrast, allows for up to 130 miles of additional snowmobile trails, and surrounds the BWCAW with "Roaded Natural" areas, in which motorized vehicle use and high visitor interaction are authorized. FEIS §§ 3.8-5, 3.8-11, 3.8-27.

Given the immediate, concrete consequences for the recreational interests of specific visitors to the Superior National Forest that result from the selection of Alternative E over other alternatives rejected in the FEIS, we conclude that the plaintiffs have shown the injury in fact necessary for standing. Unlike the plaintiffs in *Robertson*, Sierra Club alleges more than future harms from the amount, location, and method of timber harvesting permitted under Alternative E. Sierra Club also claims that its members are imminently injured by Alternative E's failure to designate additional wilderness, to close more forest roads, and to decrease motorized vehicle use near the BWCAW. These harms are incurred by plaintiffs who seek a more primitive forest experience, without regard to any future site-specific analysis or further study. The Supreme Court, while not deciding whether this sort of injury is sufficient to establish standing or ripeness, has recognized that such allegations of harm present "significantly different" issues than a claim based on future logging or clearcutting alone. *See Ohio Forestry Ass'n*, 523 U.S. at 738-39. We conclude that Sierra Club has alleged the "invasion of a legally protected interest" that is both "concrete and particularized" and "imminent." *Defenders of Wildlife*, 504 U.S. at 560 (internal quotation omitted). The causation and redressability elements of standing

are not disputed by the Forest Service, and we see no reason to conclude they are not satisfied in this case. *See id.* at 572 n.7.

### III.

We now turn to the merits of Sierra Club's NEPA claim. Sierra Club contends that its members were harmed when the Forest Service selected Alternative E over other management options. Sierra Club argues that this selection was the direct result of the agency's inadequate consideration of the effects of the various alternatives on the BWCAW, and that this inadequate consideration constituted a violation of NEPA. We must determine, therefore, whether the district court correctly granted summary judgment to the Forest Service on the ground that the agency complied with NEPA by evaluating adequately the impacts of the different management scenarios on the BWCAW. We review the district court's summary judgment decision *de novo*, applying the same standards that the district court employed. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1121 (8th Cir. 1999).

Although NEPA does not provide a private right of action, the Administrative Procedure Act ("APA") permits judicial review of agency action in this context. *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the USDA*, 266 F.3d 889, 894 (8th Cir. 2001). Under the APA, a reviewing court will not set aside agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

NEPA does not establish rules governing the substantive content of forest plans. Instead, NEPA's mandate "is essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). The statute's purpose is to "insure a fully informed and well-considered decision, not necessarily a decision the judges of [this court] would have reached had they been members of the decisionmaking unit of the agency." *Id.* NEPA does not prevent agencies from taking

environmentally harmful action, for as long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The statute requires "only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

The EIS is the primary procedural vehicle through which NEPA seeks to ensure that an agency engages in this "hard look" review of environmental consequences. *See* 42 U.S.C. § 4332. This "detailed statement," *id.* § 4332(2)(C), from which a court can assess whether the agency has made "a good faith effort to consider the values NEPA seeks to protect," must not "merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning." *Minn. Pub. Interest Research Grp. v. Butz*, 541 F.2d 1292, 1299 (8th Cir. 1976). The role of the courts in this process "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98. Whether an agency adequately considered the environmental consequences of its actions is "evidenced through the EIS's form, content, and preparation" and in the agency's "actual balance" of environmental costs and benefits. *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1128 (internal quotation omitted).

We examine the agency's FEIS to determine whether the Forest Service took a "hard look" at the environmental consequences of the July 2004 forest plan. As an initial matter, the question arises whether NEPA even required the agency to consider impacts on the BWCAW, given that the revised plan changes the management approach only for areas of the Superior National Forest *outside* of the BWCAW. Sierra Club argues that the need for this evaluation flows logically from the text of NEPA and the Council on Environmental Quality's ("CEQ") implementing

regulations. Sierra Club first points out that NEPA obligates an agency to analyze whether its action "significantly" impacts the environment. *See* 42 U.S.C. § 4332(2)(C). Citing the CEQ regulations, Sierra Club notes that to evaluate whether an action "significantly" affects the environment requires consideration of that action's "intensity." 40 C.F.R. § 1508.27. This, in turn, requires the agency to consider the "[u]nique characteristics of the geographic area such as proximity to . . . ecologically critical areas." *Id.* § 1508.27(b)(3). The BWCAW is indeed a unique geographic area, but Sierra Club's argument overlooks the fact that the cited statutory text and regulations establish the criteria for determining the threshold question whether an EIS is required at all. They do not necessarily address the content of the impact statement. *See* 42 U.S.C. § 4332; *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431-34 (8th Cir. 2004) ("If an agency takes a 'hard look' and determines that the proposed action has no 'significant' environmental impact, an EIS is unnecessary.").

The Forest Service was required, however, to consider the impacts of the alternative management scenarios on the BWCAW for another reason. NEPA made it our "national policy . . . to promote efforts which will prevent or eliminate damage to the environment and . . . to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Like the Fourth Circuit, we believe this policy "is surely implicated when the environment that may be damaged is one that Congress has specially designated for federal protection." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 186-87 (4th Cir. 2005). Congress expressly recognized the need to "protect[] the special qualities of the [BWCAW] as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation." BWCAW Act § 1, Pub. L. 95-495, 92 Stat. 1649 (1978). The guiding policy of NEPA thus requires that the Forest Service's assessment in this case include an evaluation of how the alternatives proposed in the FEIS "will affect the unique biological features of this congressionally protected area." *Nat'l Audubon Soc'y*, 422 F.3d at 187.

-14-

The Forest Service appears to concede as much, because its argument on appeal is not that consideration of impacts on the BWCAW was unnecessary, but that NEPA does not require the evaluation of those impacts to be discussed in a separate section of the FEIS, as Sierra Club suggests. We agree with the Forest Service that nothing in either NEPA or its implementing regulations prevents the Forest Service from integrating consideration of the BWCAW into its analysis of the revised plan's effects on other resources within the Superior National Forest.

The parties do seem to disagree about the level of detail required for the analysis of environmental impact. The district court concluded that the FEIS need contain only a general level of analysis, given that this case involves a revised forest plan that is programmatic in its approach. 595 F. Supp. 2d at 1030. To the extent that the impacts discussed in the plan depend on future, site-specific activity, we agree. The "hard look" required of the Forest Service is "necessarily contextual," *Nat'l Audobon Soc'y*, 422 F.3d at 187, and the degree of detail that NEPA requires in an EIS "depends upon the nature and scope of the proposed action." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). At this programmatic planning stage, the EIS "must provide sufficient detail to foster informed decision-making," but "site-specific impacts need not be fully evaluated" until the decision to undertake a site-specific project has been made. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (internal quotations omitted). For those more immediate impacts not subject to further evaluation, such as the designation of areas for wilderness study, or the prohibition of motorized recreational activities in certain forest zones, more detailed analysis is appropriate.

Our examination of the FEIS convinces us that the Forest Service took an appropriately "hard look" at the environmental consequences of the revised forest plan on the BWCAW. This is evident in three ways. First, as the district court correctly noted, the FEIS communicates a "clear intention" by the Forest Service to manage the Superior National Forest "in a way that is neutral with respect to the BWCAW." 595

F. Supp. 2d at 1029. The FEIS expressly states that the revised forest plan, under all of the management approaches considered, will "carry forward the 1993 Forest Plan" for the BWCAW and its accompanying EIS. FEIS § 1-28. The statement repeatedly confirms that "[n]o decisions were made that affect[] current management of the BWCAW." FEIS § 1-32. These pronouncements indicate that the Forest Service considered the BWCAW in its analysis, and set forth in the FEIS a policy that proposed changes have only a minimal, neutral impact on the wilderness area, such that new management direction for that area is unnecessary.

Second, the Forest Service's "hard look" is evidenced by the agency's analysis of several specific impacts to the BWCAW. The FEIS expressly considers the effect of the various management alternatives on wildlife habitats and plant species within the wilderness area. Regarding plant species, the FEIS concludes that "pine replacement in the BWCAW in stands of all ages would remain the same under all alternatives." FEIS § 3.3.4-37. For wildlife habitats, the conclusions from the agency's programmatic analysis are comparable. The FEIS states that "[t]he quality, quantity, and distribution of lynx foraging and . . . habitat . . . in the BWCAW is not significantly influenced by the proposed actions of the Revised Plans." FEIS § 3.3.4-8. Likewise, the FEIS anticipates that "the potential impact to wolves within the BWCAW would not vary by alternative." FEIS § 3.3.4-23. The same conclusion is reached for deer, § 3.3.6-29, bald eagles, § 3.3.4-37, and ruffed grouse, § 3.3.6-37. These statements demonstrate the consideration of impacts within the BWCAW, and they reflect neutrality towards the BWCAW. Given the substantially different land use patterns contemplated by the alternatives in the FEIS, these statements could not plausibly imply neutrality among the alternatives without also suggesting neutrality towards the wilderness.

Along with these "no impact" conclusions, the analysis in the FEIS recognizes that certain proposed actions could negatively affect the BWCAW. Most significantly, the FEIS considers potential "edge effects" about which Sierra Club is

-16-

concerned. The FEIS acknowledges that under the management approach adopted by the Forest Service, timber harvesting adjacent to the BWCAW in Spatial Zone 3 will likely result in "less connectivity of habitats between those found in the BWCAW" and other parts of the forest. FEIS § 3.2-60. Consequently, the FEIS instructs that "site specific analysis could consider the issue of connectivity, and through thoughtful management, could mitigate the impacts to connectivity in Zone 3." FEIS § 3.2-61. This identification of general issues for further analysis at the site-specific stage of forest planning is consistent with the "hard look" required of the Forest Service in this programmatic context. The FEIS also recognizes that certain species are vulnerable to the habitat disturbances that may occur under Alternative E. For instance, because "[a]reas adjacent to the wilderness in Spatial Zone 3 would be harvested and fragmented to a higher degree," this could create "gaps in habitat that increase risk" to the Northern Goshawk. FEIS § 3.3.6-11. Similar risks are identified for the Boreal Owl. FEIS § 3.3.5-19.

The FEIS evaluates other edge effects, including the impact of designating additional wilderness study areas adjacent to the BWCAW. Alternatives B and D call for the designation of twelve wilderness study areas next to the Boundary Waters. These areas would result in road closures and an accompanying reduction in noise pollution. The FEIS also recognizes that these designations would "provide slightly more capacity in the BWCAW," FEIS § 3.7-11, "help alleviate congestion in the BWCAW," FEIS § 3.7-11, and improve the experience of non-motorized recreationists. FEIS § 3.8-58. The Forest Service acknowledges Sierra Club's belief that "additional wilderness areas bordering the BWCAW would help buffer the Wilderness from adjacent impacts." FEIS § 1-23. Despite these potential environmental benefits of Alternatives B and D, the Forest Service ultimately adopted Alternative E, which calls for no new wilderness areas and instead authorizes motorized recreation in some of those areas. This action was preceded, however, by "an extensive [ecological] survey" indicating that the additional wilderness areas contemplated in other alternatives would not "enhance[] . . . [the] extraordinary

-17-

character [of] the BWCAW." ROD at 17. In particular, the Forest Service studied the recreational opportunities available near the BWCAW, and determined that these areas could best provide a "primitive, backcountry experience" under "less restrictive" rules than within the BWCAW, consistent with section 18 of the BWCAW Act. ROD at 18. Although Sierra Club may disagree with the merits of the Forest Service's conclusion, the agency's discussion demonstrates that it made an informed decision, and NEPA requires nothing more. *Methow Valley Citizens Council*, 490 U.S. at 351. And the Forest Service's undertaking of an "extensive survey" concerning the wilderness areas satisfies us that the agency conducted the more detailed evaluation expected of actions that have an imminent impact on the recreational and aesthetic interests of visitors to the area.

A third demonstration of the agency's "hard look" is its consideration of the environmental impacts of the forest plan on "analysis areas" that encompass the BWCAW. For several environmental indicators within the FEIS, the environmental impacts are measured for the entire Northern Superior Uplands, a geographical area that includes the BWCAW. FEIS § 3.1-24. The cumulative impacts on forest composition, § 3.2-3, spatial patterns, § 3.2-52, threatened species, § 3.3.6-10, invasive species, § 3.3.7-1, and fire, § 3.5-9, are analyzed for the Northern Superior Uplands, including the BWCAW. The BWCAW is also expressly included in the analysis area for most wildlife indicators. FEIS § 3.3.0-4.

The evaluation of impacts to watershed health in the FEIS illustrates how the agency considered the BWCAW as part of its broader analysis concerning the Northern Superior Uplands. Given the nature of stream flows, environmental effects for a watershed area will not stop at the BWCAW's administrative border. The analysis areas for several indicators of watershed health, therefore, "include, but do not differentiate between, watersheds that are inside vs. outside the BWCAW." FEIS § 3.6-41. The FEIS estimates, for example, that the increase in road construction permitted under some alternatives is likely to diminish watershed health within the

-18-

BWCAW and beyond. FEIS § 3.6-16. The FEIS therefore cautions that "concurrent actions" should be taken at the site-specific level "to offset expansion of the transportation system." FEIS § 3.6-16.

Considered together, the agency's clear intention to act with neutrality towards the BWCAW, the evaluation of specific impacts to the wilderness area (including certain "edge effects"), and the inclusion of the BWCAW within broader environmental analyses persuade us that the Forest Service took the "hard look" required of it under NEPA. We thus conclude that the Forest Service did not act arbitrarily or capriciously in its development of the FEIS.

\* \* \*

For the foregoing reasons, the judgment of the district is affirmed.

_____