# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3408
_____

State of Missouri, ex rel. Attorney General Andrew Bailey

*Plaintiff - Appellant*

v.

United States Department of Interior, Bureau of Reclamation; United States Army Corps of Engineers; Debra Haaland, Secretary of the Interior, in her official capacity; M. Camille Calimlim Touton, Bureau of Reclamation Commissioner, in her official capacity; Christine Wormuth, Secretary of the Army, in her official capacity; Brigadier General Geoff Van Epps, Northwest Division Commander, in his official capacity; Joseph E. Hall, Bureau of Reclamation Dakotas Area Manager, in his official capacity; Brent C. Esplin, Bureau of Reclamation Missouri Basin Regional Director, in his official capacity; North Dakota Garrison Diversion Conservancy District; State of North Dakota[1]

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri

_____

Submitted: November 16, 2022
Filed: July 10, 2023

_____

---

[1]Andrew Bailey has been elected to the Office of Missouri Attorney General, and Debra Haaland, M. Camille Calimlim Touton, Christine Wormuth, and Brigadier General Geoff Van Epps, have been appointed to serve in their respective capacities, and they are substituted as parties pursuant to Federal Rule of Appellate Procedure 43(c).

Before COLLOTON, SHEPHERD, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

In September 2018, the United States Department of the Interior, Bureau of Reclamation ("the Bureau") decided to move forward with a water project in North Dakota. The State of Missouri challenged the decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and the Water Supply Act of 1958 ("Water Supply Act"), 43 U.S.C. § 390b. The district court[2] granted summary judgment in favor of the Defendants. We affirm.

## I. Background

The project at the heart of this dispute is the Central North Dakota Water Supply Project. Under the proposed action, the Bureau would enter into a contract with Garrison Diversion Conservancy District to provide Garrison Diversion with access to a certain amount of water. Garrison Diversion is a North Dakota "governmental agency, body politic and corporate." N.D. Cent. Code § 61-24-02. It was established by the state's legislature to make Missouri River water available for various uses in North Dakota. *See id.* § 61-24-01.

Consistent with this mandate, Garrison Diversion is developing water supply projects in central and eastern North Dakota. Although the main project at issue in this appeal is the Central North Dakota Project, it is not the only project we need to discuss. The state-sponsored Red River Valley Water Supply Project is also relevant. We begin first with details about the Central North Dakota Project before

_____

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

turning to the Red River Valley Project. And lastly, we discuss the relevant portions of the Bureau's findings from the administrative record.

## A. Water Supply Projects

The Central North Dakota Project began with Garrison Diversion's request for twenty cubic feet per second ("cfs") of water from the McClusky Canal (approximately 14,489 acre-feet of water per year). McClusky Canal is in central North Dakota. It originates at Lake Audubon, which is fed by water pumped from Lake Sakakawea. Lake Sakakawea is a Missouri River mainstem impoundment constructed by a dam on the river, and it is regulated by the Army Corps of Engineers (the "Corps"). Lake Audubon is a "sub-impoundment" of Lake Sakakawea and is regulated by the Bureau.

Under the proposed action, Garrison Diversion would divert water from the McClusky Canal to the Red River Valley Project's main transmission pipeline. The required facilities include an intake on the McClusky Canal, a "wet well," a pump station, and a six-mile pipeline connecting the canal with the Red River Valley Project.[3] To facilitate Garrison Diversion's request, the Bureau proposed: (1) entering into a forty-year water service contract with Garrison Diversion for twenty cfs of water; (2) approving authorization of the Pick-Sloan Missouri Basin Program preference power contract with Garrison Diversion; and (3) issuing the necessary permits for Garrison Diversion's use of the Bureau's land, including a twenty-five-year special use permit for the pipeline and other required facilities.

Now we turn to the Red River Valley Project. This project began as a statutorily authorized federal project. *See* Dakota Water Resources Act of 2000, Pub. L. 106–554, § 608(b), 114 Stat. 2763A–281, 287. Pursuant to the statute's requirements, the Bureau completed an environmental impact statement ("EIS") for the project in 2007, but the necessary federal authorization was never finalized.

---

[3]Only 0.10 miles of the pipeline would be on the Bureau's land.

Instead, North Dakota decided to independently pursue a separate, but similar, state-sponsored project under the same name. One change was that the project increased in volume from 122 cfs to 165 cfs.

The state-sponsored project is planned and coordinated by Garrison Diversion, and the Bureau maintains that it will be completed without the approval or involvement of the Bureau. Its purpose is to provide water from the Missouri River to central and eastern North Dakota during times of water scarcity. The main transmission pipeline will travel west to east and transport water across the continental divide from the Missouri River Basin into the Hudson Bay Basin. This is known as an "inter-basin transfer," and the administrative record suggests such a transfer could implicate the 1909 Boundary Waters Treaty between the United States and Canada.

## B. Administrative Reports

The Bureau issued the Environmental Assessment for the Central North Dakota Project in July 2018 and a Finding of No Significant Impact in September 2018. Two parts of the Environmental Assessment that are particularly relevant are the Bureau's analysis of Missouri River depletions and its explanation for why the Central North Dakota Project does not involve an inter-basin transfer. We first provide a brief overview of the Environmental Assessment findings before discussing the Bureau's Finding of No Significant Impact.

For its Missouri River depletions analysis, the Bureau determined it was "sufficient and appropriate" to rely on a 2013 study conducted for the Northwest Area Water Supply Project and an accompanying supplemental EIS. According to the Bureau, the final cumulative effects report for the Northwest Area Project was "the most recent and comprehensive analysis of its kind within the Missouri River Basin and included historic, existing and reasonably foreseeable future actions . . . ." In addition, the Bureau updated the reasonably foreseeable actions list by including

the state-sponsored Red River Valley Project and taking into account the project's increase in volume from 122 cfs to 165 cfs.

The Bureau found "the net change in the volume of . . . future action depletions is nearly zero." Thus, the Bureau determined it was "reasonable to conclude that the potential impacts of the [Central North Dakota Project] on the Missouri River Mainstem System would be very similar to the potential impacts disclosed in the [Northwest Area Project Supplemental EIS] and those impacts were negligible." The Bureau also observed the Central North Dakota Project would increase annual depletions of the Missouri River above Garrison Dam by about one-fifth of one percent and "the effects on reservoir levels and dam releases would likely not be measurable."

The Bureau has maintained that the Central North Dakota Project will not have "inter-basin impacts." To support this conclusion, the Bureau relied on two primary features of the project. The first feature is that Garrison Diversion requested the water for use only within the Missouri River Basin. Indeed, the proposed contract between the Bureau and Garrison Diversion will include a condition to that effect. The second feature is its proposed infrastructure. Technology at the canal intake pump station will adjust the withdrawal rate to match the delivery need within the basin, and "flow meter[s] and control valve[s]" will be used "to monitor and regulate the flow leaving the" Red River Valley pipeline. According to the Bureau, this technology ensures no more water will be withdrawn from the canal than is actually used in the Missouri River Basin.

After completing the Environmental Assessment, the Bureau issued a Finding of No Significant Impact, considering the project's context and intensity consistent with the factor-based analysis in 40 C.F.R. § 1508.27 (2018). The Bureau stated the Central North Dakota Project had "no predicted long-term effects" and "no significant effects on public health or safety." Construction of the facilities at the McClusky Canal would permanently impact approximately 0.20 acres of land, and construction impacts from the six-mile pipeline would be temporary. In addition,

the Bureau did not identify effects on the quality of the human environment that could be "considered highly controversial." Nor were there effects on the human environment that could be considered "highly uncertain or to involve unique or unknown risks."

The Bureau decided to move forward with the Central North Dakota Project and enter into a water service contract with Garrison Diversion. The State of Missouri sued various federal and state entities and officials under the APA, 5 U.S.C. §§ 701–706. Missouri alleged the Bureau violated NEPA, 42 U.S.C. §§ 4321–4347, and the Water Supply Act, 43 U.S.C. § 390b. The State of North Dakota intervened as a defendant. The parties filed cross-motions for summary judgment. The district court denied Missouri's motion and granted the Defendants' cross-motion as to each count. Missouri appeals.

## II. Analysis

On appeal, Missouri asserts the district court erred by granting summary judgment in favor of the Defendants and that it should have instead granted summary judgment in Missouri's favor. "We review the district court's summary judgment decision *de novo*, applying the same standards that the district court employed." *Sierra Club v. Kimbell*, 623 F.3d 549, 558 (8th Cir. 2010). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree the APA is the appropriate vehicle for Missouri to obtain review of the Bureau's action under NEPA and the Water Supply Act. *See Sierra Club*, 623 F.3d at 558–59 (applying the APA to review a claim under NEPA); *In re ACF Basin Water Litig.*, 554 F. Supp. 3d 1282, 1294–95, 1299–1301 (N.D. Ga. 2021) (applying the APA to review a claim under the Water Supply Act). When a court reviews an agency's action under the APA, it will not set that action aside unless the challenger can show the action is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Sierra Club*, 623 F.3d at 559 (quoting 5 U.S.C. § 706(2)(A)); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005) (burden of proof rests with the plaintiff).

An agency action is arbitrary and capricious if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Cent. S.D. Co-op Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 894 (8th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## A. Water Supply Act

Missouri first argues the Bureau violated the Water Supply Act when it decided to move forward with the Central North Dakota Project without first getting approval from Congress. The Water Supply Act clarifies that federal water infrastructure may be used to assist states and local interests in developing domestic, municipal, and industrial water supplies. *See* 43 U.S.C. § 390b(a). To carry out that policy, the Water Supply Act "provided that storage may be included in any reservoir project surveyed, planned, constructed, or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water . . . ." *Id.* § 390b(b).

The Water Supply Act has an important limitation, though. Congressional approval is required for certain modifications of reservoir projects. Subsection (e) states:

Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law.

*Id.* § 390b(e).

In Missouri's view, the Central North Dakota Project involves a change to a reservoir project that "would seriously affect the purposes" of the Missouri River Mainstem Reservoir System; therefore, the statute required the Bureau to consult Congress before moving forward with the project. The Defendants respond that they had adequate project-specific authorization under the Garrison Diversion Unit Act of 1965, Pub. L. 89–108, 79 Stat. 433, as first amended by the Garrison Diversion Unit Reformulation Act of 1986, Pub. L. 99–294, 100 Stat. 418, and then later amended by the Dakota Water Resources Act of 2000, Pub. L. 106–554, 114 Stat. 2763A–281 (collectively, the "Garrison Diversion Act").

Missouri's first rebuttal to the Defendants' argument is that the Bureau's authority to enter into the water service contract is irrelevant to whether the Bureau needed to obtain Congressional approval under the Water Supply Act. This line of reasoning begins from the premise that the Water Supply Act's requirements are free-standing from other federal laws. This premise is flawed. Subsection (e) of the Water Supply Act requires an agency to obtain Congressional approval for certain "modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage . . . ." *See* 43 U.S.C. § 390b(e). There is no requirement that water storage be authorized specifically under the Water Supply Act itself. Simply put, Congressional approval is Congressional approval. If the Bureau and the other defendants had sufficient project-specific authorization, they need not seek additional approval again under the Water Supply Act.

Missouri's second rebuttal is that the Garrison Diversion Act does not provide the Bureau adequate authority. We understand Sections 1 and 8 of the Garrison Diversion Act to be the primary relevant sections. Section 1(a)(2) states that one of Congress's purposes was to "meet the water needs within the State of North Dakota, including municipal, rural and industrial water needs, as identified in the Garrison Diversion Unit Commission Final Report." Garrison Diversion Unit Reformulation Act of 1986, Pub. L. 99–294, 100 Stat. 418, 418, *amended by* Dakota Water Resources Act of 2000, Pub. L. 106–554, § 602, 114 Stat. 2763A–281, 281. Section 1(b) states the Secretary "is authorized to plan and construct, jointly with the State of North Dakota, a multi-purpose water resource development project within the State of North Dakota providing for irrigation, municipal, rural, and industrial water" among other things, if those plans are "substantially in accordance with the plans set out in the Garrison Diversion Unit Commission Final Report dated December 20, 1984, as modified by the Dakota Water Resources Act of 2000." *Id.* Section 8(a) directs the Secretary of the Interior to construct the Red River Valley Water Supply Project. *See* Dakota Water Resources Act of 2000, Pub. L. 106–554 § 608(b), 114 Stat. 2763A–281, 287–89. Authorizations under Section 8 are limited to projects that do not involve an out-of-basin transfer. *See id.*

Missouri points out that Congress's purpose was not to provide the Bureau unlimited authority to do whatever it wanted to meet the water needs of North Dakota. Instead, as Missouri notes, the authorization is limited by the scope of the specific final report mentioned in the Garrison Diversion Act. Furthermore, Missouri implies Section 8 does not provide adequate authorization because out-of-basin transfers were not authorized under that section. Although we agree with Missouri's observations generally, we conclude Missouri has not met its burden to show the Bureau's reliance on the Garrison Diversion Act was erroneous here. *See South Dakota*, 423 F.3d at 800 (placing burden of proof on the plaintiff).

First, Missouri has not shown the Central North Dakota Project is outside the scope of the 1984 Garrison Diversion Final Report. Second, Missouri's only argument that the Central North Dakota Project involves an out-of-basin transfer is

to point to its connection with the Red River Valley Project's main transmission pipeline. Missouri has not, however, attempted to explain why the conditions in the contract and the technology associated with the project—"flow meter[s] and control valve[s]" that "monitor and regulate the flow leaving the" Red River Valley pipeline—will not prevent an out-of-basin transfer. *Cent. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894–95 (providing that if "the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies'") (quoting *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999)). Without more, we are unable to conclude the Bureau's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

## B. National Environmental Policy Act

Next, Missouri argues the Bureau did not comply with NEPA, 42 U.S.C. §§ 4321–4347. "NEPA does not establish rules governing the substantive content of" federal water plans. *See Sierra Club*, 623 F.3d at 559. "Instead, NEPA's mandate 'is essentially procedural.'" *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)); *see also Wise v. Dep't of Transp.*, 943 F.3d 1161, 1163 (8th Cir. 2019) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process." (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

NEPA obligates agencies "to consider every significant aspect of the environmental impact of a proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee*, 435 U.S. at 553). It is not about preventing "unwise" agency action—just "uninformed" action. *See Robertson*, 490 U.S. at 351. For that reason, so long as an "agency take[s] a 'hard look' at the environmental consequences before taking a major action," NEPA is not violated, even if the

agency action could have a harmful environmental impact. *Sierra Club*, 623 F.3d at 559 (quoting *Balt. Gas & Elec.*, 462 U.S. at 97).

## 1. Environmental Impact Statement

Missouri argues the Bureau should have issued an EIS for the Central North Dakota Project. An EIS serves as "the primary procedural vehicle" to ensure an agency takes a "hard look" at an action's environmental consequences. *Id.* (citing 42 U.S.C. § 4332). However, "[i]f an agency takes a 'hard look' and determines that the proposed action has no 'significant' environmental impact, an EIS is unnecessary." *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431 (8th Cir. 2004). A "hard look" in this context, means "identify[ing] the 'relevant areas of environmental concern,' mak[ing] a 'convincing case that the impact was insignificant,' and, if the impact is determined to be significant, convincingly establish[ing] that changes in the project will sufficiently reduce that impact." *Id.* (quoting *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992)).

The Bureau did not issue an EIS for the Central North Dakota Project because it found the environmental impact of the project was insignificant. Missouri argues this was a violation of the Bureau's obligations under NEPA. Our role then is limited to asking whether the Bureau identified the "relevant areas of environmental concern" and made "a convincing case" the impact of the project on the environment really is insignificant. *Id.*; *accord Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 45 F.4th 104, 113 (D.C. Cir. 2022) ("The court's role in reviewing an agency's decision not to prepare an [EIS] is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." (internal quotation marks omitted)).

We understand the linchpin of Missouri's argument to be that the Bureau's cumulative effects analysis needed to consider the Red River Valley Project together with the Central North Dakota Project. In Missouri's view, to do otherwise results in an improper segmentation of a former federal project. This argument stems from

the federal regulation that clarifies how agencies determine the appropriate scope of an EIS. The regulation states, "[t]o determine the scope of [an EIS], agencies shall consider . . . [c]onnected actions, which means that they are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1) (2018). The D.C. Circuit has referred to this as the "connected-actions doctrine." *See Big Bend Conservation All. v. Fed. Energy Regul. Comm'n*, 896 F.3d 418, 423–24 (D.C. Cir. 2018).

The connected-actions doctrine does not compel a conclusion in Missouri's favor. The purpose of the doctrine is "prevent[ing] the government from segmenting *its own federal actions* into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration." *Id.* at 423–24 (emphasis added) (internal quotation marks omitted). Therefore, the "doctrine does not require the aggregation of federal and non-federal actions." *Id.* at 424. The Red River Valley Project is a state-sponsored project that will be completed without the Bureau's approval or involvement. Thus, the Bureau's decision to limit the scope of the Environmental Assessment to the Central North Dakota Project was not arbitrary and capricious.

Missouri also argues the Bureau should have prepared an EIS for the Central North Dakota Project because an EIS was prepared for another North Dakota project that involved a comparable volume of water: the Northwest Area Project. We disagree. Although the volume of water involved is certainly a consideration of a proposed project's environmental impact, it is not the only consideration. As the administrative record in this case shows, other considerations may include the impacts on endangered species, air quality, noise, recreation, public safety, transportation, paleontological resources, wildlife disruptions, and visual resources, just to name a few. The agency takes all these things into account when it considers a project's impact on the environment. For this reason, comparison of two projects—even two projects involving a comparable amount of water—may be unhelpful in determining whether a project has a significant environmental impact.

Based on the arguments presented, Missouri has not met its burden to show the Bureau's decision to forgo an EIS for the Central North Dakota Project was arbitrary and capricious. The Bureau appropriately identified the "relevant areas of environmental concern" and made "a convincing case" the impact of the project on the environment really is insignificant. *See Heartwood*, 380 F.3d at 431.

## 2. Environmental Assessment

Next, Missouri takes issue with the Environmental Assessment the Bureau completed for the Central North Dakota Project. Missouri argues the cumulative effects analysis was inadequate and that the Bureau failed to adequately consider the Central North Dakota Project's downstream impacts. We ultimately find both arguments unpersuasive.

An environmental assessment is a preliminary report prepared by an agency to determine if an EIS is required by NEPA. *See Del. Riverkeeper Network*, 45 F.4th at 108. Federal regulations provide that an environmental assessment shall: "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (2018). In responding to a challenge to the substance of an environmental assessment's cumulative effects analysis, we have explained an environmental assessment "will be ruled deficient only if it does not include a cumulative impact analysis or is not tiered to an EIS that contains such an analysis." *See Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005). We recognized, however, that tiering may not cure every defect. *Id.*

Missouri argues the Bureau failed to consider the cumulative effects and the downstream impacts of the Central North Dakota Project in conjunction with the expanded Red River Valley Project. The record does not support this claim. The incorporated supplemental EIS from the Northwest Area Project shows the Bureau considered the downstream impacts of depletions by taking into account historic depletions, present level depletions, net depletions, and future water project

depletions. Furthermore, the Environmental Assessment for the Central North Dakota Project expressly included the state-sponsored Red River Valley Project in the list of reasonably foreseeable actions. And it stated that it had taken into account that the state-sponsored project had increased in volume from 122 cfs to 165 cfs.

Missouri also asks us to second-guess the Bureau's analysis of the no-action depletions scenario based on alleged discrepancies between the current storage capacity of the Missouri River system and the future storage capacity in the studies, as well as the relationship to drought cycles. But we have said, "when the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Cent. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894–95 (cleaned up). Based on our careful review of the record, we are unable to conclude the Bureau acted arbitrarily and capriciously when it found the Central North Dakota Project's potential impacts were "negligible."

### 3. Consideration of Alternative Projects

Lastly, Missouri argues the Bureau did not take a "hard look" at the Central North Dakota Project because it considered only one alternative to the proposed action—a no-action alternative.[4] Again, we disagree. First, the range of alternatives the Bureau needed to consider was diminished because of its finding that the project would have a minimal environmental effect. *See id.* at 897. Furthermore, the Central North Dakota Project was, at best, of a modest size, involving just one-eighth the water quantity of the state-sponsored Red River Valley Project and permanently impacting less than a quarter-acre of land from the pump station and canal facilities. In addition, the Bureau considered the project based on the request of Garrison

---

[4]The first part of Missouri's argument on this point is that the Bureau's purpose and need statement was inadequate because it did not consider the Red River Valley Project. Because we have concluded the agency's decision to limit its analysis to the Central North Dakota Project was not arbitrary and capricious, this argument is without merit.

-14-

Diversion, which specifically sought a long-term water contract for twenty cfs. These facts suggest a long list of alternatives was simply unnecessary. *Cf. Missouri Mining, Inc. v. I.C.C.*, 33 F.3d 980, 984 (8th Cir. 1994) ("The Commission did not waive its obligation to study appropriate alternatives; rather, it merely determined that the two [specific] proposals were the only alternatives that reasonably needed to be evaluated.").

Missouri also argues the Bureau should have considered a contract for a shorter period of time, a smaller volume of water, and alternative sources of water. We conclude these arguments were not preserved for judicial review. The Supreme Court has indicated that objections to an environmental assessment on the basis of failing to adequately discuss potential alternatives may be forfeited if those alternatives were not identified during the administrative process. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004). Our careful review of the record has not revealed any place these alternatives were identified during the administrative process, and Missouri has not argued such alternatives were raised. Instead, Missouri argues that considering a contract for a shorter period of time or a smaller volume of water was so obvious they did not need to be raised below to be preserved for judicial review. *See id.* at 765 (stating, "an [environmental assessment's] or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action"). For the same reasons explained above, we disagree. The Bureau's decision not to consider other alternatives beyond the no-action alternative was not arbitrary and capricious.

### III. Conclusion

The judgment of the district court is affirmed.
_____