# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 9, 2019   Decided May 1, 2020

No. 19-1044

IN RE: PUBLIC EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY AND HAWAII COALITION MALAMA PONO,
PETITIONERS

On Petition for Writ of Mandamus

*Paula N. Dinerstein* argued the cause and filed the briefs for petitioners.

*Eric Grant*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Andrew C. Mergen* and *Ellen Durkee*, Attorneys, and *Catherine Basic*, Attorney, Federal Aviation Administration.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This case arises out of the underwhelming—and ultimately unsuccessful—efforts of the Federal Aviation Authority (FAA) and National Park Service (NPS) to regulate commercial sightseeing flights over national parks. The Air Tour Management Act of 2000 directs the FAA

and NPS to "make every effort" to establish rules governing such flights within two years of the first application. Although applications have been pending at twenty-five parks for nearly two decades, the agencies have fulfilled their statutory mandate at only two. Petitioners seek a writ of mandamus to compel the agencies to regulate air tours at seven parks where they have injured members. Because the agencies have failed to timely do so, we grant the petition.

I

A

The Air Tour Management Act of 2000 requires vendors who wish to conduct commercial air tours over certain national parks and tribal lands to first obtain a permit from the FAA. *See* Pub. L. No. 106-181, §§ 801-809, 114 Stat. 61, 185-94 (codified as amended at 49 U.S.C. § 40128 and note). The Act provides that the FAA, "in cooperation with" the NPS, "shall establish an air tour management plan . . . whenever a person applies for authority to conduct a commercial air tour operation." 49 U.S.C. § 40128(b)(1)(A). Management plans must go through notice and comment and comply with the National Environmental Policy Act (NEPA). *See id.* § 40128(b)(2), (b)(4)(B). Management plans may "prohibit" air tours entirely or place certain conditions on them, such as "maximum or minimum altitudes," "time-of-day restrictions," "maximum number of flights per unit of time," and "mitigation of noise, visual, or other impacts." *Id.* § 40128(b)(3)(A)-(B).

Congress directed the agencies to act with dispatch. The Act provides that the FAA "shall make every effort to act on [an] application . . . and issue a decision . . . not later than 24 months after it is received or amended." *Id.* § 40128(a)(2)(E). But because Congress recognized that this process couldn't be

completed overnight, the Act also allowed the FAA to grant "interim operating authority," *id*. § 40128(c)(1), (c)(3), to existing tour operators so they "would not be put out of business," Notice of Final Opinion on the Transferability of Interim Operating Authority Under the National Parks Air Tour Management Act, 72 Fed. Reg. 6,802, 6,803 (Feb. 13, 2007).

The agencies' efforts to comply with the Act got off to a promising start. In 2000, they established the National Park Overflights Advisory Group, and by 2002, they had published a rule defining "commercial air tour operations" and launching a permit application system. *See* National Parks Air Tour Management, 67 Fed. Reg. 65,662 (Oct. 25, 2002). But trouble began to brew when the agencies started to respond to the operators' applications. Each agency prioritized different goals and sought to retain as much control over the process as possible. *See* Lusk Decl. ¶ 45; Trevino Decl. ¶¶ 21-24. The FAA emphasized air traffic safety; the NPS, protecting park resources and visitor experience. As a result, the agencies bickered over everything from responsibility for making certain NEPA determinations to the proper metric for measuring baseline noise levels. For example, the NPS "sought sole jurisdiction" over environmental "impact determinations on park resources," but the FAA refused to "abdicat[e]" its role in that process or defer to the "park superintendent's professional judgment." Lusk Decl. ¶ 45. "The inability to resolve these issues" often brought "work to a standstill." *Id.*

To be sure, the agencies kept busy. Despite their infighting, they took steps to establish management plans at sixteen parks, holding stakeholder meetings, drafting documents, and conducting noise studies. But because the agencies "were never able to resolve a number" of their squabbles, *id.*, they never got "beyond [the] initial stages of environmental review" at any park, Gov't Br. 11, and "never

issued a draft [management plan or] NEPA document . . . for public review and comment," Lusk Decl. ¶ 45.

Twelve years passed, and the agencies still hadn't come up with a single management plan. In an effort to speed things up, Congress amended the Act to exempt parks with fifty or fewer air tours per year and permit the agencies to enter into voluntary agreements in lieu of management plans. *See* FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 501, 126 Stat. 11, 100-03 (codified at 49 U.S.C. § 40128(b)(7)). Voluntary agreements are more flexible and easier to implement. The agencies need not jump through as many procedural hoops to create them, as they aren't subject to NEPA and don't require full-dress notice and comment. 49 U.S.C. § 40128(b)(7)(C). But there's a catch—voluntary agreements must be, well, voluntary. Unlike management plans, voluntary agreements can't be imposed without operator approval. What's more, to substitute for a management plan, the voluntary agreement must be unanimous; all operators possessing interim operating authority must sign on. *Id.* § 40128(b)(7)(A). A single holdout can force the agencies back to the drawing board.

After Congress amended the Act, the agencies agreed to put management plans on the back burner and focus their efforts on voluntary agreements. They anticipated that these agreements would be easier to complete, and they were right— to some extent.

In 2015 and 2016, the agencies finalized voluntary agreements with the air tour operators at Big Cypress National Preserve and Biscayne National Park, bringing these parks into compliance with the Act. But the statutory fix was no magic bullet. Getting air tour operators to sign on to voluntary agreements without the credible threat of a management plan

proved difficult. Each operator gains a competitive advantage by hanging on to their (largely unregulated) interim authority while their rivals voluntarily accept restrictions. *See* Sauvajot Decl. ¶ 7; Trevino Decl. ¶¶ 47-48. Unable to credibly threaten holdouts with the prospect of a stricter management plan, the agencies lack the necessary leverage to bring everyone to the table. For example, although the agencies drafted partial agreements for Glen Canyon National Recreation Area and Rainbow Bridge National Monument, those agreements don't yet pass muster under the Act because two of the nine operators have refused to join. Still, the agencies have pressed on. They are currently working on voluntary agreements for Badlands National Park and Mount Rushmore National Memorial.

B

In 2018, Public Employees for Environmental Responsibility and the Hawaii Island Malama Pono Coalition—organizations representing national park employees, visitors, and hiking guides—filed a petition for a writ of mandamus that would compel the agencies to establish management plans or voluntary agreements within two years at seven parks: Bryce Canyon National Park, Glacier National Park, Great Smoky Mountains National Park, Haleakala National Park, Hawaii Volcanoes National Park, Lake Mead National Recreation Area, and Muir Woods National Monument.[*] We dismissed that petition for lack of Article III standing because it listed only the FAA as respondent and

---

[*] The agencies inform us that Muir Woods National Monument is now exempt from the Act's requirements because it has fewer than fifty overflights per year and the NPS hasn't exercised its statutory authority to withdraw that exemption. *See* Gov't 28(j) Letter (Dec. 4, 2019); 49 U.S.C. § 40128(a)(5)(A)-(B). Thus, we do not include it in the relief afforded here.

Petitioners' injuries weren't redressable by the FAA alone. *See In re Pub. Emps. for Envtl. Responsibility*, No. 18-1044 (D.C. Cir. Nov. 13, 2018) (per curiam). Petitioners' new filing, which names both the FAA and NPS as respondents, does not suffer from this jurisdictional defect.

In response to this litigation, the agencies produced a schedule for bringing into compliance one park named in the petition and six other parks. This plan sets target dates for establishing voluntary agreements at Badlands National Park, Great Smoky Mountains National Park, Mount Rainier National Park, and Mount Rushmore National Memorial, ranging from January 31, 2020 to March 31, 2022. If the agencies can't produce unanimous voluntary agreements at those parks within eighteen months, the plan calls for the agencies to develop management plans. The plan also calls for the agencies to establish management plans at Death Valley National Park, Glen Canyon National Recreation Area, and Rainbow Bridge National Monument by May 31, 2022 at the latest. The agencies have not offered a proposed timeline for Petitioners' other parks but pledge they will "begin preparatory work in additional parks on a rolling basis." Savaujot Suppl. Decl. ¶ 24.

## II

Before addressing the merits of the petition, we must first assess our jurisdiction.

## A

Our court has exclusive jurisdiction over mandamus petitions alleging unreasonable agency delay whenever a statute commits review of the relevant action to the courts of appeals. *See Telecomms. Research & Action Ctr. v. FCC*

(*TRAC*), 750 F.2d 70, 75 (D.C. Cir. 1984) (explaining that this statutory commitment of review, "read in conjunction with the All Writs Act," gives this court jurisdiction); *see also* 28 U.S.C. § 1651 (All Writs Act). The courts of appeals have exclusive jurisdiction to review the FAA's management plans and voluntary agreements, including any predicate environmental determinations by the NPS. *See* 49 U.S.C. §§ 40128(b)(5), 46110(a); *cf. City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (holding that a challenge to a FERC order gave us jurisdiction to review a predicate biological opinion prepared by another agency). Accordingly, we have jurisdiction over this mandamus petition under the All Writs Act.

B

Petitioners assert associational standing to seek relief. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The agencies do not dispute, and we agree, that Petitioners satisfy the second and third elements. However, the agencies question whether Petitioners satisfy the first element. They do.

To establish standing to sue in their own right, Petitioners' members must show injury in fact, causation, and redressability. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). Petitioners' members include frequent hikers, whose enjoyment of the woods is marred by the intrusive noise of overflights. *See, e.g.*, Contreras Decl. ¶¶ 6-7; Hingson Decl. ¶¶ 5-9; Plakanis Decl. ¶¶ 3-10. This is a cognizable aesthetic and recreational injury. *See Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). It is caused by the agencies' failure to regulate air tours and could be redressed by a grant of mandamus relief.

The agencies raise two objections to redressability, but neither is persuasive. First, the agencies object that "there is no guarantee that air tour impacts would be reduced with the implementation of plans or voluntary agreements." Gov't Br. 18. But Petitioners need not show that relief is "*certain,*" *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983) (internal quotation marks omitted), only that it is "substantial[ly] likel[y]," *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (internal quotation marks omitted). Management plans may prohibit air tours altogether or establish certain conditions, including noise mitigation, 49 U.S.C. § 40128(b)(3)(A)-(B), and plans "shall include incentives . . . for the adoption of quiet aircraft technology," *id.* § 40128(b)(3)(D); *see also id.* § 40128(b)(7)(B) (similar for voluntary agreements). Plans and agreements are thus substantially likely to mitigate the noise impact of air tours.

Second, the agencies object that Petitioners' injuries aren't redressable because the agencies haven't violated a nondiscretionary duty, so mandamus relief is inappropriate. *See* Gov't Br. 18-22. But that argument confuses standing with the merits, which we address next. *See Consol. Edison Co. of N.Y. v. Ashcroft*, 286 F.3d 600, 604-06 (D.C. Cir. 2002) (finding standing but denying mandamus relief on the merits).

### III

"Our consideration of any and all mandamus actions starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a

clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). This is the rare case in which mandamus relief is appropriate. For nineteen years, the agencies have failed to comply with their statutory mandate despite Congress's command to "make every effort" to do so within two years of an application. 49 U.S.C. § 40128(a)(2)(E). And the agencies' latest proposed schedule is too little, too late. At some point, promises are not enough; judicial intervention is needed.

A

Before granting mandamus relief, we must "satisfy ourselves that the agenc[ies] ha[ve] a duty to act." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). The agencies argue that they do not. In their view, "completion of a management plan [or voluntary agreement] is not a ministerial, clear-cut, or non-discretionary duty" because they must exercise their "discretion" over "the environmental analyses and action [that they] will approve." Gov't Br. 20.

This argument confuses the *creation* of the plans with their *content*. While the latter may be discretionary, the former is not. As the agencies concede, "the Air Tour Management Act generally *requires* [the] establishment of plans or voluntary agreements for non-exempt parks." *Id.* (emphasis added). The Act provides that the agencies "*shall* establish an air tour management plan . . . whenever a person applies for authority to conduct a commercial air tour operation." 49 U.S.C. § 40128(b)(1)(A) (emphasis added). The agencies may not ignore this clear command. Petitioners do not seek to control the content of the plans; they "simply seek[] to compel the [agencies] to make decisions within the statutory time frames."

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016). That is an appropriate subject for mandamus relief.

B

In evaluating a petition for mandamus relief based on unreasonable agency delay, we consider six factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal citations and quotation marks omitted). No one factor is determinative, and "[e]ach case must be analyzed according to its own unique circumstances." *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984). Our analysis of the six *TRAC* factors convinces us mandamus relief is warranted.

1

The majority of the *TRAC* factors favor granting relief. Time is "[t]he first and most important factor." *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). The

Act directs the agencies to "make every effort" to rule on applications within two years, 49 U.S.C. § 40128(a)(2)(E), but after nineteen, the agencies have little to show for their labors. Although "[t]here is no *per se* rule as to how long is too long," a "reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers*, 372 F.3d at 419 (internal quotation marks omitted); *see also Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[A] reasonable time for an agency decision could encompass months, occasionally a year or two, but not several years or a decade." (internal quotation marks omitted)). Indeed, we have found far shorter delays than nineteen years to be "nothing less than egregious." *In re Am. Rivers*, 372 F.3d at 419 (six years); *see also In re Bluewater Network*, 234 F.3d at 1316 (nine years); *Air Line Pilots Ass'n*, 750 F.2d at 85-86 (five years); *cf. Nader v. FCC*, 520 F.2d 182, 206 (D.C. Cir. 1975) ("[N]ine years should be enough time for any agency to decide almost any issue." (citation omitted)).

The agencies argue that the Act's timeline is aspirational. *See* Gov't Br. 23-25. But even the lack of a hard deadline "does not give government officials carte blanche to ignore their legal obligations." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). Although the Act does not impose a rigid schedule, it provides a ruler against which the agencies' progress must be measured. And that progress simply doesn't measure up.

The agencies further insist that their task is complicated and time intensive. *See* Gov't Br. 28-29. Of course, a reasonable time for action depends on "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). But the failure to meet the timeline in this case is primarily attributable to interagency conflict, not

financial or personnel shortages. Mandamus relief can't make money grow on trees, but it can end an interagency turf war.

Most of the remaining *TRAC* factors either favor granting relief or are neutral. "[T]ak[ing] into account the nature and extent of the interests prejudiced by delay," 750 F.2d at 80, we note that park visitors are among the Act's intended beneficiaries and the ones most harmed by the agencies' listless pace. Granting relief will aid these visitors by reducing the disruptive impacts of air tours. *See* 49 U.S.C. § 40128(b)(1)(B) (stating that an "objective of any air tour management plan" should be to mitigate "adverse impacts" on "visitor experiences"). Moreover, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Though this is not a case where inaction risks life and limb, *see Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983), the agencies' failure to regulate air tours harms visitor welfare to some extent by exposing visitors to unmitigated noise pollution, *see* H.R. REP. NO. 106-167, at 95 (1999) (noting that the FAA has "responsibility for . . . protecting the public health and welfare from aircraft noise."). Thus, these factors are at least neutral toward Petitioners.

2

Only one *TRAC* factor—competing agency priorities— seems to favor the agencies. Precedent directs us to "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. The agencies argue that (1) regulating commercial air tours is only one "small component" of their missions, which must compete for resources with other projects; and (2) we should not upset the agencies' newly proposed schedule, which prioritizes some parks over others. Gov't Br. 29-31.

But the agencies' competing obligations cannot justify their nineteen-year holdup. *See Cobell*, 240 F.3d at 1097 ("[N]either a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay."). Although we appreciate that it may be difficult for the agencies to complete management plans or voluntary agreements at all of the outstanding parks in the two years that Petitioners request, that doesn't make mandamus relief inappropriate. Recognizing that the agencies have legitimate resource-based concerns, we order the agencies to propose a schedule for bringing all parks into compliance. In crafting this schedule, the agencies should bear in mind that Congress expected them to complete the task in two years.

Moreover, while we will not grant mandamus relief that serves only to put the petitioner "at the head of the queue" while "mov[ing] all others back one space," *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991), we need not reorder the agencies' priorities to grant relief here. Petitioners "are not asking to jump the line." Oral Arg. Tr. 13:6-7. By ordering the agencies to produce a schedule, we do not require them to address any particular park first. The agencies remain free to choose the order, provided they bring all parks into compliance within a reasonable timeframe.

Finally, the agencies implore us to allow them to try out their new plan before granting mandamus relief. Had the agencies submitted a plan imposing reasonable deadlines for all parks, we might agree. But they did not. The agencies' plan covers only seven of the twenty-three outstanding parks. And while many of these parks have partial voluntary agreements or low levels of air tours, the agencies still anticipate that their plan will take up to four years to complete. That is too long.

In any event, the agencies have already missed some of the target dates they've set for themselves. For example, the agencies promised to publish final voluntary agreements with fixed-wing operators at Badlands National Park and Mount Rushmore National Memorial by January 31, 2020. Sauvajot Supp. Decl. ¶¶ 15, 17. It's now May, and the agencies still have not published either agreement. *See National Park Units Requiring Air Tour Management Plans*, FAA, https://www.faa.gov/about/office_org/headquarters_offices/arc/programs/air_tour_management_plan/park_specific_plans; *see also* Gov't 28(j) Letter (Dec. 6, 2019) (explaining that the agencies were also "unable to meet [their] target" for publishing "notices of draft voluntary agreements" at these parks). If the agencies can't stick to their own plan with the threat of judicial supervision hanging over them, how can we expect them to do so when the threat is gone?

IV

Left to their own devices, the agencies have failed to comply with their statutory mandate for the past nineteen years. Accordingly, we grant the petition for a writ of mandamus and order the agencies to produce a schedule within 120 days of the issuance of this opinion for bringing all twenty-three parks into compliance. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554-56 (D.C. Cir. 1999) (ordering an agency to produce a schedule in response to a mandamus petition and retaining jurisdiction); *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 343-46 (D.C. Cir. 1980) (same); *Nader*, 520 F.2d at 207 (same).

We fully expect that the agencies will make every effort to produce a plan that will enable them to complete the task within two years, as Congress directed. If the agencies anticipate that

it will take them more than two years, they must offer specific, concrete reasons for why that is so in their proposal.

The court will retain jurisdiction to approve the plan and monitor the agencies' progress. After the plan is approved, the agencies are directed to submit updates on their progress every ninety days until their statutory obligations are fulfilled.

*So ordered.*