# United States Court of Appeals
## For the Eighth Circuit

_____

Nos. 24-1065/24-1066

_____

Badger Helicopters Inc.; Black Hills Aerial Adventures, Inc.; Rushmore
Helicopters, Inc.

*Petitioners*

v.

Federal Aviation Administration; U.S. Department of the Interior, National Parks
Service

*Respondent*s

Coalition to Protect America's National Parks; Public Employees for
Environmental Responsibility

*Intervenor*s

------------------------------

Black Hills Helicopters, Inc.

*Amicus on Behalf of Respondent*

_____

Petitions for Review of an Order of the
Federal Aviation Administration

_____

Submitted: March 18, 2025
Filed: September 4, 2025

_____

Before COLLOTON, Chief Judge, ERICKSON and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

This case involves the federal government's regulation of sightseeing air tours over two units of the National Park System, specifically Mount Rushmore National Memorial and Badlands National Park. In 2023, federal agencies issued air tour management plans for those parks, banning all commercial air tours over them. Air tour companies petitioned this court, arguing the agencies' decisions must be vacated because they were arbitrary and capricious. Concluding otherwise, we deny the petitions to vacate the plans.

## I. Background

In 2000, Congress passed the National Parks Air Tour Management Act (Air Tour Management Act), which required commercial vendors seeking to conduct air tours over units of the National Park System and certain tribal lands to first obtain authorization from the Federal Aviation Administration (FAA). *See* Pub. L. No. 106-181, §§ 801-809, 114 Stat. 61, 185–94 (codified as amended at 49 U.S.C. § 40128). The Air Tour Management Act provides that the FAA, "in cooperation with" the National Park Service, "shall establish an air tour management plan . . . whenever a person applies for authority to conduct a commercial air tour operation over" a national park or tribal land. 49 U.S.C. § 40128(b)(1)(A). These air tour management plans (ATMPs) must go through notice and comment and include an environmental decision in accordance with the National Environmental Policy Act (NEPA). *See id*. § 40128(b)(2), (b)(4)(B). ATMPs may "prohibit" air tours entirely or place certain conditions on them, such as "maximum or minimum altitudes," "time-of-day restrictions," "maximum number of flights per unit of time," and "mitigation of noise, visual, or other impacts." *Id.* § 40128(b)(3)(A)–(B). Recognizing it could take time to implement ATMPs, Congress directed the FAA to

"grant interim operating authority" to existing air tour operators. *Id.* § 40128(c)(1), (c)(3).

The agencies began formulating ATMPs for Mount Rushmore National Memorial and Badlands National Park (Parks). In 2004, the FAA published a notice of intent to prepare environmental assessments for the Parks. Notice of Environmental Assessment for Badlands National Park ATMP, 69 Fed. Reg. 20658 (Apr. 16, 2004); Notice of Environmental Assessment for Mount Rushmore National Memorial ATMP, 69 Fed. Reg. 20660 (Apr. 16, 2004). But the work stalled. This was not unique, as a decade after the enactment of the Air Tour Management Act, the agencies had not implemented ATMPs for any parks. So in 2012, Congress amended the Air Tour Management Act to permit the agencies to enter into voluntary agreements in lieu of ATMPs. *See* FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 501, 126 Stat. 11, 100–03 (codified at 49 U.S.C. § 40128). The voluntary agreements required fewer administrative hurdles, and the agencies thus focused on implementing these instead of ATMPs.

After further delays of agency action, organizations representing national park employees, visitors, and hiking guides filed a petition for a writ of mandamus in the D.C. Circuit. *See In re Pub. Emps. for Env't Resp.* (*In re PEER*), 957 F.3d 267, 271 (D.C. Cir. 2020). These organizations asked the D.C. Circuit to compel the agencies to establish ATMPs or voluntary agreements within two years at certain parks. *Id.* In response to the litigation, the agencies developed a schedule for bringing seven parks, including the two at issue here, into compliance with the Air Tour Management Act. *Id.* The D.C. Circuit granted the writ for mandamus, ordering the agencies to adopt ATMPs or voluntary agreements for every park. *Id.* at 275.

In 2020, while *In re PEER* was being considered by the D.C. Circuit, the agencies notified those companies that held interim operating authority for the Parks that the agencies were terminating their voluntary agreement negotiations and transitioning to developing ATMPs. The agencies claimed they were changing course because one of the active tour operators was unwilling to participate in the

voluntary agreement process. The hold-out tour operator had less than 1% of the interim operating authority allowance per year for each of the Parks. Later that year, the FAA published an official notice of its decision to develop ATMPs for twenty-three parks, including those at issue here. Notice of Intent to Complete ATMPs at 23 National Park Units, 85 Fed. Reg. 55060 (Sept. 3, 2020).

For the Parks, the agencies considered four ATMP alternatives: (1) allowing the current interim operating authority air tours to continue without change; (2) prohibiting air tours; (3) allowing a certain total number of air tours from May 1 through September 30 with daily limits, minimum altitudes, and prescribed routes; and (4) allowing a lower total of air tours during a shorter time period with daily limits, minimum altitudes, and prescribed routes. Ultimately, in 2023, the agencies issued final ATMPs for the Parks (the Plans), prohibiting all commercial air tours over the Parks and the area within a half mile of the Parks' boundaries, except for limited authorized purposes. The agencies' final decisions explained that air tours negatively affected visitor experience, wildlife, and tribal cultural experiences. The agencies thus believed banning air tours best fit the goals of the Parks.

Tour operators — Badger Helicopters Inc., Black Hills Aerial Adventures Inc., and Rushmore Helicopters Inc. (Petitioners) — timely filed petitions for review (Petitions) with this court, arguing the Plans are arbitrary and capricious, an abuse of discretion, and otherwise contrary to law. The agencies urge this court to deny the Petitions and uphold the Plans. We permitted Public Employees for Environmental Responsibility and the Coalition to Protect America's National Parks to intervene and also defend the Plans.

Petitioners moved to stay the Plans pending further review, but this court denied their motion. The petitioners, agencies, and intervenors all moved to supplement the administrative record, which we considered with the merits of the Petitions and now deny the motions. *See Rochling v. Dep't of Veteran Affs.*, 725 F.3d 927, 936 (8th Cir. 2013).

## II. Analysis

This case comes to us pursuant to 49 U.S.C. § 46110(a), which allows "a person disclosing a substantial interest in an order issued by" the FAA, in whole or in part under statutory sections including the relevant section, to "apply for review of the order by filing a petition for review in . . . the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110. *See also id.* § 40128(b)(5) ("An [ATMP] developed under this subsection shall be subject to judicial review."). Because Petitioners' principal places of business are in South Dakota, we have jurisdiction to review the Petitions.

Petitioners ask us to review whether the Plans comply with the Air Tour Management Act, NEPA, and the Administrative Procedure Act (APA). Under the APA, we must "hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In conducting our analysis, we "review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." *Id.* § 706.

An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). To comply with this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). In short, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was

reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025).

## A. Ending Voluntary Agreement Negotiations

Petitioners first claim the Plans are arbitrary and capricious because the agencies ended the voluntary agreement process with Petitioners without a satisfactory explanation. Petitioners recognize the Air Tour Management Act allows the agencies to choose between pursuing voluntary agreements or ATMPs. Indeed, the subsection on voluntary agreements states that "[a]s an alternative to an air tour management plan," the agencies "may enter into a voluntary agreement with a commercial air tour operator." 49 U.S.C. § 40128(b)(7). We find no reason to vacate the Plans based on the agencies' choice to develop ATMPs.

The agencies explained to Petitioners at the time that they were pivoting to ATMPs that they were doing so because one of the tour operators refused to participate in the voluntary agreement process. Though the uncooperative tour operator held less than 1% of the interim operating authority, our role is not to second-guess the wisdom of the agencies' decision as long as it is reasonable. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one"). Under pressure from organizations seeking a writ of mandamus in the D.C. Circuit, *see In re PEER*, 957 F.3d at 271, the agencies anticipated the obstacle of an uncooperative operator and chose a different path. As explained in their official notice of termination and intent to pursue ATMPs, the agencies recognized their past efforts to comply with the Air Tour Management Act and the D.C. Circuit requiring them to bring twenty-three parks into compliance with the Air Tour Management Act. *See* Notice of Intent to Complete ATMPs at 23 National Park Units, 85 Fed. Reg. at 55060–61. Rather than having a voluntary agreement that did not cover all tour operators and having to deal with one entity who would not participate, the agencies developed ATMPs. The agencies' switch to ATMPs pursuant to the governing statute was not arbitrary or

capricious. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 917–18 (D.C. Cir. 2024) (concluding "it was not arbitrary for the Agencies to reverse course" when "the Agencies acknowledged their change of course and provided a reasonable explanation for it").

## B. Alleged Violations of NEPA

Petitioners next raise three arguments about how the Plans issued under the Air Tour Management Act are arbitrary and capricious because they violated certain NEPA-related provisions. The Air Tour Management Act requires ATMPs to include an "environmental decision document" under NEPA. *See* 49 U.S.C. § 40128(b)(2). Based on this requirement, Petitioners argue the agencies violated NEPA by failing to use reliable data, failing to consider a reasonable range of alternatives, and failing to consider aviation safety. Before turning to those arguments, we first address the agencies' argument that Petitioners may not challenge the Plans on NEPA grounds because Petitioners' interests are not within NEPA's zone of interests.

### i. Zone of Interests

The Supreme Court "has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The zone-of-interests test "is not meant to be especially demanding." *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The word "arguably" means that "the benefit of any doubt goes to the plaintiff." *Id.* A suit will thus fail the zone-of-interests test "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

"Because the APA provides an omnibus cause of action for violations of other statutes, the 'relevant statute' for an APA zone-of-interests analysis is not the APA itself, but the statute under which the relevant agency acted." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1991 n.4 (2025). "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quotations omitted).

The agencies argue that Petitioners assert solely the economic interests of their for-profit air tour businesses, so they are outside the zone of interests protected by NEPA. Petitioners respond by arguing that their challenges to the Plans are based on the Air Tour Management Act, which expressly requires NEPA compliance, and that they are therefore within the zone of interests to bring NEPA claims under the Air Tour Management Act. We agree with Petitioners.

Here, the agencies "acted" under the Air Tour Management Act to develop the Plans. *See R.J. Reynolds Vapor Co.*, 145 S. Ct. at 1991 n.4. The objective of these ATMPs is "to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of *commercial air tour operations* upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B) (emphasis added). The Air Tour Management Act directly regulates Petitioners' commercial air tour operations. *See id.* § 40128(a)(1) ("A commercial air tour operator may not conduct commercial air tour operations over a national park . . . except . . . in accordance with any applicable air tour management plan . . . ."). The Air Tour Management Act also expressly provides that an ATMP "shall be subject to judicial review," *id.* § 40128(b)(5), and another statutory section provides that for some FAA orders, like those at issue here, "a person disclosing a substantial interest in" those orders "may apply for review of the order by filing a

-8-

petition for review in" a federal court of appeals, *id.* § 46110(a). In fact, the Plans specifically discussed the right to appeal the Plans provided by 49 U.S.C. § 46110. Congress clearly intended to allow Petitioners to challenge the Plans.

The Air Tour Management Act also expressly provides that, "[i]n establishing an air tour management plan," the agencies "shall each sign the environmental decision document required by section 102" of NEPA. 49 U.S.C. § 40128(b)(2). It acknowledges that an environmental decision document "may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan." *Id.* Because the NEPA environmental analysis is statutorily part of the ATMP process, the Petitioners' legislatively conferred ability to challenge the Plans encompasses their NEPA-related claims. *See Lexmark*, 572 U.S. at 127; *Patchak*, 567 U.S. at 225–28. We conclude Petitioners may challenge aspects of the underlying environmental document produced pursuant to NEPA and required under the Air Tour Management Act.[1]

---

[1]The agencies primarily rely on two Eighth Circuit decisions to argue Petitioners cannot use NEPA to challenge the Plans. *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't of Agric.*, 266 F.3d 889, 896–97 (8th Cir. 2001); *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038–39 (8th Cir. 2002). But since those decisions, "the Supreme Court has greatly narrowed the doctrine of prudential standing," so we exercise caution before expanding those cases to address circumstances involving the Air Tour Management Act. *See Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020) (citing *Lexmark*, 572 U.S. at 127). Besides, "[i]ndividuals motivated in part by protection of their own pecuniary interest can challenge administrative action under NEPA provided that their environmental concerns are not so insignificant that they ought to be disregarded altogether." *Robinson v. Knebel*, 550 F.2d 422, 425 (8th Cir. 1977) (concluding landowners were within NEPA's zone of interests when their tillable land, ability to hunt, and farming operations were at stake). Here, Petitioners have environmental concerns related to the Plans because Petitioners' business of sightseeing relies on the environmental quality and sustainability of the Parks. *Cf. Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1126 (8th Cir. 1999) (concluding plaintiffs' claims were within the zone of interests when they asserted "their own inability to

## ii. NEPA Arguments

Turning to the NEPA-related arguments, we are guided by the Supreme Court's recent reminder that "NEPA is a procedural cross-check, not a substantive roadblock." *See Seven Cnty.*, 145 S. Ct. at 1507. "Under NEPA, an agency's only obligation is to prepare an adequate report." *Id.* at 1511. The statute's procedural requirement is intended "to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or [the Supreme Court] would have reached had they been members of the decisionmaking unit of the agency." *Id.* at 1514 (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). In short, "the central principle of judicial review in NEPA cases is deference." *Id.* at 1511.[2]

With this in mind, we turn to the environmental assessments prepared for these Plans. The assessments analyzed the four alternatives considered by the agencies and the impacts of those alternatives on several environmental impact categories: noise and noise-compatible land use; air quality and climate change; biological resources; cultural resources; wilderness; visitor use and experience and other recreational opportunities; environmental justice and socioeconomics; visual

---

fully enjoy the BWCA Wilderness as a result of the [agency's] visitor use restrictions, a claim which is closely related to the physical environment").

[2]*Seven County*'s emphasis on deference has even greater force here because we deal with only an environmental assessment, whereas there the agency had to prepare an environmental impact statement (EIS). *See* 145 S. Ct. at 1510. An EIS addresses agency action reasonably foreseen to have "significant effect" on the environment and requires "a detailed written statement." 42 U.S.C. §§ 4336(b)(1), 4336e(6). In contrast, an environmental assessment is "a concise public document" designed to determine what environmental impact an agency action may have and whether an EIS is necessary. *See id.* § 4336(b)(2); *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998). Since an environmental assessment demands a less onerous analysis, we will not impose stricter judicial review on it than we would for an EIS.

effects; and Department of Transportation Act Section 4(f) resources.[3]  Petitioners' challenge focuses primarily on three aspects of the environmental assessments: (a) data and resources relied upon; (b) number of alternatives considered; and (c) aviation safety.  We address each in turn.

### a.  Data and Resources

Petitioners first argue that the agencies failed to "make use of reliable data and resources" as required by NEPA.  *See* 42 U.S.C. § 4332(E).  Petitioners criticize the agencies' choice of data in conducting their noise analyses and determinations about potentially affected animal species in the Parks.  We find no error requiring us to vacate the Plans.

Starting with the agencies' noise analyses, Petitioners do not challenge the agencies' modeling, but rather the underlying inputs used for the modeling, specifically the flight operation data and the non-air tour noise.  They argue the agencies inadequately analyzed the impact of air tours on noise in the Parks because they used flight operation data collected from tour operators in 2019 and certain noise data collected in 2003.

For their noise impact analyses, the agencies used the FAA Aviation Environmental Design Tool computer program to model aircraft noise exposure for the existing operations.  The program requires certain data inputs to model the predicted impacts of different plan alternatives.  For inputs related to aircraft data, the agencies used the aircraft type, operational information, and flight route information that they obtained from the operators in 2019.  They also took the three-year average of air tours from 2017 to 2019.  For data on the Park Service's administrative flights for the Badlands National Park, they used average hours for the Park Service's administrative flights from 2011 to 2022.  And for inputs related

---

[3]Section 4(f) resources include "the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." *See* 49 U.S.C. § 303(a), (f)(1).

-11-

to natural ambient and existing ambient noise, the agencies used data from published reports detailing 2003 sound level measurements taken at multiple locations within the Parks.

The agencies used a three-year average from 2017 to 2019 "because they reflected relatively current air tour conditions, represented reliable operator reporting of air tours, accounted for variations across multiple years, were available during the planning effort, and excluded years that were atypical due to the COVID-19 pandemic." The agencies "decided against using 2021 or 2022 data due to continued abnormalities associated with the COVID-19 pandemic and the unavailability of reporting data for 2021 or 2022 during most of the planning effort." Petitioners claim the flight routes and altitudes in 2019 were outdated because they modified their tours in 2021. Petitioners fault the agencies for not requesting updates on their flight operation information and instead using the data the tour operators had already provided in 2019. But this data choice does not make the Plans arbitrary or capricious.

Adopting Petitioners' position would mean, as the agencies developed the Plans, tour operators could change their flight patterns at any time and require the agencies to redo their analyses. At the time the agencies were developing the Plans, the interim operating authority did not provide any operating conditions for air tours other than an annual limit of flights. The agencies recognized this reality in their draft environmental assessments, noting that under the no-action alternative, "[r]outes and altitudes may change, depending on an operator's preference to change routes or fly higher or lower than they currently are flying." Thus, requiring up-to-date information about the operators' current flight operations here "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). The agencies' choice of flight data was reasonable because it relied on reliable data, which was in the agencies' view, "the most accurate and current data available during the period that th[ese Plans

-12-

were] being drafted." *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1011 (D.C. Cir. 2002) (quotation omitted).

Petitioners also argue that the agencies acted arbitrarily by relying on natural and ambient noise data from 2003, rather than investigating current conditions, when comparing "the noise impact of the existing operations to the Parks' natural ambient conditions and to the overall acoustic environment of the Parks." Though the agencies' use of twenty-year-old data for some inputs is somewhat concerning, Petitioners do not argue the agencies had been given more recent data. *Cf. Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (holding agency acted arbitrarily and capriciously when the agency "recognized that it was relying on outdated data and that it had been presented with more recent data, but it chose to continue relying on the outdated data without explaining why"). Nor do they contest the accuracy of the past reports, arguing only that the data is older than they would prefer. They thus ask us to speculate the current natural and ambient noise environment changed so much from 2003 to 2023 that the agencies were required to undertake a new study. Yet they do not explain how the natural noise would have changed in the last twenty years to impact the data. And as to ambient noise, they cite vague extra-record evidence about road construction, maintenance projects, and changed travel patterns. We are unpersuaded that relying on the 2003 data for parts of the agencies' noise analyses renders the Plans arbitrary or capricious, particularly in light of NEPA's instruction that an agency "is not required to undertake new scientific or technical research unless" that "research is essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable." *See* 42 U.S.C. § 4336(b)(3). The same goes for the flight operation data and the administrative flight data. Whatever weakness the data may have had from a lapse of time or varying time periods did not nullify its ability to show the potential noise impact of the various plan alternatives and to inform the agencies' decision-making.

From a broader perspective, the data selections were only part of the noise analyses, which were only part of the agencies' larger environmental analyses,

which were only part of the agencies' considerations for their final decisions. *See Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1129 (8th Cir. 1999) ("Even assuming the data was flawed in some respects, this one study was not the only source of information used by the Forest Service in compiling the Final EIS."). And the "ultimate question" we must resolve is whether the agencies' final decisions were "reasonable and reasonably explained," not the adequacy of any given component of the environmental assessments. *Seven Cnty.*, 145 S. Ct. at 1514. Though the agencies could have defined in greater detail the effect of the air tours by undertaking newer studies, we must afford "substantial deference" to the agencies' choices in their NEPA analyses and "not micromanage" choices "about the depth and breadth of [their] inquiry." *Id.* at 1513. As "we have said, 'when the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise," in this case noise measurements in national parks and the potential noise change over a twenty-year period, "we must defer to the informed discretion of the responsible federal agencies.'" *See Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 581 (8th Cir. 2023) (quoting *Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't of Agric.*, 266 F.3d 889, 894–95 (8th Cir. 2001)).

Moreover, "[e]ven if the agency's data is flawed, if the agency has relied on a number of findings and only some are erroneous, we must reverse and remand only if 'there is a significant chance that but for the errors the agency might have reached a different result.'" *Cent. S.D.*, 266 F.3d at 899 (quoting *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1129). Here, the agencies were concerned with multiple considerations, such as the impact of air tours on visitors' experiences and statements by tribal nations in opposition to all air tours over the Parks, all of which the Air Tour Management Act allowed the agencies to factor into their Plans. *See* 49 U.S.C. § 40128(b)(1)(B) (stating ATMPs should address adverse impacts on visitor experience and tribal lands caused by air tours). Even if new noise measurements would show an increase in certain types of noise from 2003 to 2023, it would not make unreasonable the conclusion that air tours contribute additional non-natural noise or other disturbances that detract from the congressionally

-14-

authorized objectives stated in the Air Tour Management Act. Ultimately, there is not a significant chance that changing certain noise inputs in the agencies' noise impact analyses would have led to different Plans, so there is no prejudicial error. *See* 5 U.S.C. § 706.

Petitioners also challenge the agencies' determinations about air tours impacting bighorn sheep and peregrine falcons in the Parks. They claim that the Plans noted "only speculative and generalized harm of noises to the species," failing to show air tours caused harms to the bighorn sheep and peregrine falcons. But "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Seven Cnty.*, 145 S. Ct. at 1507. Here, the agencies noted that air tours pass over a prime area for bighorn sheep lambing in the Badlands Park and that 70% of the sheep in the Park were lost in 2021 due to disease. As to the peregrine falcons, the agencies noted that a pair nested in Mount Rushmore Park in 2020 had four offspring, none of which survived. The agencies noted both species are susceptible to noise disturbance and that stressors such as air tour noise could impact their populations. The fact the agencies did not determine whether air tours directly caused the species' population losses in the Parks, or that different flight altitudes and patterns may cause less harm, does not make the agencies' Plans arbitrary or capricious.

NEPA "is not about preventing 'unwise' agency action—just 'uninformed' action." *Missouri ex rel. Bailey*, 73 F.4th at 579 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)). We conclude the agencies' determinations about the bighorn sheep and peregrine falcons do not merit us vacating the Plans.

### b. Alternatives

Petitioners' second NEPA-related argument is that the agencies failed to consider a reasonable range of alternatives. NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in

any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). But "[w]hen an agency has concluded through an Environmental Assessment that a proposed project will have a minimal environmental effect, the range of alternatives it must consider to satisfy NEPA is diminished." *Cent. S.D.*, 266 F.3d at 897. An agency need not "pursue policy alternatives that are contrary to the pertinent statutory goals, or do not fulfill a project's purpose." *Id.* (citation omitted). "[A]n agency may revoke a standard if it reasonably explains the available evidence and offers a rational connection between that evidence and its choice." *Id.* at 898. "[P]etitioners must establish that their preferred route is within the range of alternatives that reasonably needed to be considered." *Mo. Mining, Inc. v. Interstate Com. Comm'n*, 33 F.3d 980, 984 (8th Cir. 1994).

The agencies considered four plan alternatives for each Park during and after the public commenting process: (1) allow current flight operations to continue without change; (2) prohibit air tours; (3) restrict air tours through altitude minimums and by limiting flight months, daily flights, and annual flights; and (4) restrict air tours through altitude minimums and by further limiting flight months, daily flights, and annual flights. Petitioners complain the agencies did not consider alternatives that adjusted flight altitudes or routes.

While the agencies did not include alternatives that would have adjusted the flight routes or altitudes from the current flight operations, they considered doing so and concluded otherwise. For the Badlands Plan, the agencies considered adjusting the altitudes but determined it was not feasible given the location of the current private heliport near the Park boundary. Likewise, they considered moving the routes but also determined that doing so and mitigating noise was not feasible because it would result in flying over the Badlands' Wilderness area, negatively affecting Wilderness character. For Mount Rushmore, the agencies explained that the park "is very small (only 1,278 acres), thus the agencies were not able to include routes or altitude adjustments in Alternatives 3 or 4 due to safety concerns."

It is for Petitioners to establish their preferred alternative is within the range of alternatives that reasonably needed to be considered. *See Mo. Mining, Inc.*, 33 F.3d at 984. Yet they do not provide specific information about flight altitudes or routes that could alleviate the agencies' concerns, and the administrative record shows the agencies considered and rejected including other alternatives like those preferred by Petitioners. Again, "when the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Missouri ex rel. Bailey*, 73 F.4th at 581 (quotation omitted). For these reasons, the agencies fulfilled the NEPA requirement to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(H); *see also Friends of the Boundary Waters Wilderness*, 164 F.3d at 1128 (explaining the court is guided by the rule of reason and considers whether the agency "adequately sets forth sufficient information to allow the decision-maker to consider alternatives and make a reasoned decision after balancing the risks of harm to the environment against the benefits of the proposed action"). We find no reversible error with the agencies' consideration of alternatives to their recommended course of action.

### c. Aviation Safety

Petitioners' third and final NEPA-related argument is that the Plans are arbitrary and capricious because Petitioners allege the agencies failed to consider aviation safety. In making their argument, they rely on 40 C.F.R. § 1501.3(b)(2)(iii) (2020), which required agencies to consider adverse effects on "public health and safety." *Id.* Here, the Plans' findings of no significant impact stated that "[t]he FAA reviewed the ATMP to identify and address any safety concerns. The FAA also reviewed all public comments received on the draft ATMP that raised safety concerns." The findings also stated that "[u]nder FAA regulations, the pilot-in-command is always required to take action to ensure the safe operation of the aircraft." For Mount Rushmore, the FAA explained that it would "evaluate the establishment of an operational plan in the area to enhance safety." In response to

comments on the proposed Mount Rushmore ATMP about aviation safety, the agencies explained the FAA would "perform outreach with air tour operators and other stakeholders to encourage the development of an operational plan to enhance safety." Moreover, both Plans explicitly provide that they may be amended if the FAA "determines that the ATMP is adversely affecting aviation safety and/or the national aviation system." Notably, these Plans will be implemented against the backdrop of the FAA's "rules governing the operation of aircraft within the United States." *See* 14 C.F.R. § 91.1. We therefore conclude Petitioners' consideration of impact on aviation safety outside the Parks' boundaries does not render the Plans arbitrary or capricious.

## III. Conclusion

For the foregoing reasons, we conclude the agencies' decisions were reasonable and therefore deny the petitions to vacate the air tour management plans.

_____